SAM A. BEATTY, Retired Justice.
The plaintiff, Douglas Pope, appeals from a summary judgment for the defendant, Dr. James E. Elder. We affirm.
Our supreme court has transferred this case to this court pursuant to § 12-2-7(6), Ala.Code 1975.
Douglas Pope and his late wife, Linda Pope, filed a medical malpractice action against Dr. William N. Viar, Jr., and AMI Brookwood Medical Center (“Brookwood”). The Popes alleged that the defendants were guilty of negligence in failing to discover a breast cancer in Linda Pope. The Popes later added Dr. Elder as a defendant by substitution for a fictitious defendant. After Linda Pope died, Douglas Pope filed a suggestion of death. Thereafter, Dr. Viar and Brookwood were voluntarily dismissed; thus, Dr. Elder was the sole remaining defendant. Ultimately, all claims were disposed of except the claim alleging wrongful death and Douglas Pope’s claim for loss of consortium.
Linda Pope had discovered a lump in her right breast in May or June 1986. A mammogram suggested that the lump was malignant. Mrs. Pope later underwent a needle *732 biopsy at the University of Alabama at Birmingham. The biopsy results were positive for cancer. Dr. Viar, a general surgeon, evaluated Mrs. Pope on October 13, 1986. He admitted her to Brookwood on October 17 for a surgical biopsy; that biopsy confirmed the diagnosis of breast cancer, described as infiltrating ductal carcinoma. On that same day, Mrs. Pope underwent a modified radical mastectomy of her right breast, performed by Dr. Viar. During that procedure, axillary lymph nodes and resected breast tissue were removed and sent to the Brookwood pathology department.
Dr. Elder was the pathologist who examined these specimens. He performed microscopic examinations of the 46 lymph nodes and breast tissue, and he reported that he found no pathologic diagnosis, i.e., no cancer in the lymph nodes. Mrs. Pope’s primary tumor, nevertheless, was removed with her right breast.
On July 5, 1988, Dr. Viar examined Mrs. Pope for a skin rash located at the site of earlier breast reconstruction surgery. He biopsied the rash and discovered it to be recurrent breast cancer. Dr. Viar then referred Mrs. Pope to Dr. John G. Hankins, an oncologist, who admitted her to Brookwood on August 9, 1988, to begin chemotherapy. Dr. Hankins found that Mrs. Pope’s recurrent breast cancer had inflammatory characteristics which, he said, made it an aggressive, incurable disease.
Nevertheless, after discussing with the Popes an experimental treatment program involving high-dose chemotherapy with auto-logous bone marrow transplant support treatments at Duke University in North Carolina, and receiving their concurrence, Dr. Hankins had Mrs. Pope seen and treated by Dr. Jon Goekerman, a hematologist/oncologist, who first saw her on August 18, 1988. Dr. Goekerman also obtained the original pathology slides prepared after Mrs. Pope’s 1986 mastectomy. These were the same slides examined previously by Dr. Elder. The Duke pathology department found a single micrometastasis in one of the 46 nodes. This node-positive micrometastasis was less than two millimeters in diameter, and, according to Dr. Goekerman, was not significant in his treatment of Mrs. Pope.
Although Mrs. Pope received an autolo-gous bone marrow transplant at Duke and follow-up chemotherapy in Birmingham, she ultimately died on July 11,1989.
Dr. Elder moved for a summary judgment on two distinct grounds: (1) his contention that the Popes’ sole expert, Dr. Kenneth J. Fawcett, was not a “similarly situated health care provider” as required by § 6-5-548, Ala. Code 1975, and thus, could not testily about the standard of care expected of Dr. Elder, and (2) his contention that the Popes presented no expert testimony that his failure to identify the malignant cells in one of Mrs. Pope’s lymph nodes was the proximate cause of her death.
A plaintiff alleging medical malpractice must establish through expert medical testimony (1) that the defendant breached the standard of care and (2) that the breach proximately caused the injuries or harm of which the plaintiff complains. Levesque v. Regional Medical Ctr. Bd., 612 So.2d 445, 448 (Ala.1993).
This court need not address Pope’s argument regarding the standard of care because, after reviewing the record, we are convinced that Dr. Elder made a prima facie showing that any failure on his part to properly interpret the subject slide was not the proximate cause of Mrs. Pope’s death, and that Pope offered no substantial evidence to rebut that showing. See § 12-21-12, Ala. Code 1975.
In support of his motion for summary judgment, Dr. Elder offered the depositions of Dr. Hankins, Dr. Goekerman, and Dr. Viar.
Although Dr. Hankins testified that had he received a pathology report in 1986 indicating one positive node out of 46 from a 39-year-old woman, with infiltrating ductal carcinoma of the right breast, he would have recommended an adjuvant program,[1] he further testified as follows:
*733 “Q. ... [W]hat will early detection of the infiltrating ductal carcinoma have [to do with] the success of adjuvant chemotherapy in those patients?
“A. You’re making a leap, and just making two statements. I’m not too sure that they can be bridged without a whole lot of explanation.
“Q. Maybe I don’t understand. Let me tell you where I’m coming from. I see it on TV, I see it in my own doctor’s office, where they’re always talking about doing breast exams for the purposes of early detection of breast cancer.
“A. That’s a different question. You leaped to the adjuvant form_ The earlier the disease is detected, statistically, the better chances for cure are. But, that doesn’t say that a two-millimeter lesion cannot become widespread, nor does it say a ten-centimeter lesion with all the nodes involved, once it’s removed, cannot be cured. It’s just statistically one has an 80% chance of cure, and one has a 90 or a 100% chance of death, or 99% chance of death.
[[Image here]]
“Q. What caused Linda Pope’s death?
“A. Conjecture would be that it was ... a respiratory death, but it was due to probably a vasculitis involving the vessels of the lung.
“Q. Is that related to the cancer that she had?
“A. Probably not. It can ... have other origins. The thought is that it is possibly related to the chemotherapy. The data is still out on that.... But at the same time, she still had disease.
[[Image here]]
“Q. ... [Ajssuming that [she died of a respiratory ailment], and also assuming that she still has the cancer and she has gone through the therapy; and as I understand what you’re saying that she didn’t die of the cancer, she just still has the disease; correct?
“A. Or she would have died of it in time. From what I remember, by the time she had gotten what she had, you weren’t looking at a good or even a close to complete response; and eventually or fairly rapidly, it would have progressed.
[[Image here]]
“Q. Am I correct that there is no way in the world for you to testify under oath in this case that you would have cured her, her disease, with the adjuvant chemotherapy that would have been available; you can’t say that, can you?
“A. That’s correct.
“Q. Even today in oncology for this type of tumor, the doctors in your specialty talk in terms not of cure of the disease, but in terms of statistical delay in reoccur-rence; is that correct?
“A. Some people think there may be an increased chance of cure. But if you follow the analysis of the survival of people who have or have not had chemotherapy, I believe those numbers are out to about 3 to 10 years now.
“The last analysis of that I saw, which would have been in July of ’89 at the ASCO meetings was that ... there are about 20% more alive in the treatment group than in the nontreatment group. Both of the populations of the treated' group and the nontreated group are still continuing to die at about the same rate, except the treated group is about two years later.
“Now, probably the best opinion is that while there may be a population of people that you have cured, more likely the explanation is that you prolong the disease-free survival.
[[Image here]]
“Q. • • ■ [Wjhen you talk about those statistics, you talk about hopefully a large scale study—
“A. Thousands of patients.
*734 “Q. —thousands of experiences. And that doesn’t say one way or another for Linda Pope whether if she had had adju-vant therapy, whether she would, in fact, have had any prolonged disease-free survival?
“A. That’s correct.
“Q. Much less cure?
“A. That’s correct.
“Q. ... [Y]ou [were asked] earlier about early detection of cancer. I think we’ve all heard about that.
“Is it also true that the earlier the patient seeks initial treatment subsequent to having been advised that she had a positive mammogram that was highly suspicious of breast cancer, the earlier that patient seeks treatment from any physician, the greater her chance for some good therapy?
“A. Statistically, yes; the potential would be greater for a cure.
“Q. Conversely, the longer a patient would delay after having been given that information that she likely had breast cancer, the longer she delayed in seeking treatment, the lesser her chances for some prolonged disease-free survival?
“A. Statistically, yes.
“Q. Knowing what you knew about this tumor at the time you first saw this patient, can it be fairly said that this was an aggressive tumor of the type that would ... have a very rapid doubling rate?
“A. Yes. Up until recently ..., if you [found] inflammatory breast cancer, [it was] inoperable. It’s like in a node-cell carcinoma, you don’t cure people with surgery.
“Q. That would fit in with being a very rapid and aggressive tumor?
“A. Yes.
“Q. Even if we accept the assumption that you referred to earlier that some physicians have that lymph nodes in the area into which a breast tumor, of course, spreads, there is a time at which a first micrometastasis appears in the lymph node; is it not?
“A. Correct.
“Q. And there’s a time at which sometime prior to that at which there are no micrometastases present?
“A. Correct.
“Q. The more aggressive a tumor is and the more rapid its doubling rate and rate of growth, the faster it will spread in the lymph nodes; is that a fair assumption?
“A. The faster it would have a tendency to spread somewhere.
“Q. Right. The dissection of 45 lymph nodes and examination of those nodes by Dr. Elder in this case, would reflect a very thorough node examination; wouldn’t it?
“A. Yes. Dissection would have been by the surgeon, and as I stated previously, I imagine an average would be 15 nodes. Forty-five is a very large number of nodes.
[[Image here]]
“Q. ... There’s nothing that you know of that suggests that [Dr. Elder] did anything other than the best he could do at the time of the examination?
“A. No, sir.
[[Image here]]
“Q. Can you say to a reasonable medical certainty that if the adjuvant chemotherapy had been instituted in October of ’86 in Linda Pope, that her chances of survival would have been increased?
[[Image here]]
“A. The bottom line of that is no, but you have to separate increased survival, prolonged disease-free survival from projected cure.”
In Dr. Goekerman’s testimony, he explained the use of adjuvant therapy in treating patients with breast cancer:
“A. ... And the story of breast cancer — it’s important to remember that adju-vant or additional therapy was used for decades before it ever was proven to be effective. It is only with the studies from the NSABP in the late ... ’60s, early ’70s, that it was shown, in fact, to be useful as a treatment. Up until then, the data was controversial.
“Q. Okay. Now, among those criteria, you say the three that you believe are the *735 most important are what the tumor looks like, is it nasty looking, I think—
“A. Well, there’s a grading system, but that’s a simple way to describe it.
“Q. The size of the tumor and the number of the nodes that are positive?
“A. Correct.
“Q. Back in [1986], you’ve got findings from Linda Pope on your new patient evaluation and ... in your discharge and at various other points in your records. If you add to that the finding from Dr. Gott-fried that she had the positive node, would she meet the risk/benefit criteria that, in your opinion, she would be someone who would get adjuvant chemotherapy because it’s likely that she may have this metastasis?
[[Image here]]
“A. In 1986, she would meet those criteria because her tumor was ... middle size. We consider less than one centimeter, small; less than a half centimeter, ideal; bigger than three centimeters, concerning. So she is sort of midline.
“She had the positive lymph node. And one positive lymph node puts her in a group where there is a chance that she will have recurrence of her breast cancer at about a fifty percent level. That is, of a hundred patients like her with this [criterion], she would have about a ... fifty percent chance that her breast cancer had already spread outside the breast despite the best efforts of the surgeon at the time.... And, therefore, she would meet the criteria then for adjuvant therapy.
“Q. Okay. What if ... it was as originally reported to Linda, in other words, no positive nodes, all negative? ... In ’86, again. Does she meet the criteria then?
“A. In 1986, no, because the criteria for treatment of women who have negative lymph nodes [weren’t] really evolved until ... about the early 1990’s, very late ’80s, but not in ’86 to treat what was termed ‘node-negative’ breast cancer.
“Even today, there would be some debate as to whether she would receive adju-vant therapy with it. And the thing I can’t remember is what Dr. Gottfried graded that breast cancer, which is the one thing I would—
“Q. Three.
“A. Three. So today with a grade III and 1.5 centimeter nodule, she probably would have received adjuvant chemotherapy, and no nodes.
“Q. And no nodes? So—
“A. But that’s a change in our thinking.
“Q. Right. That is — and I guess that evolution from ’86 to today, where in ’86 they would not have treated someone with a grade III, 1.5 centimeter, negative nodes, and today we would now treat that, is ... that thinking based on statistics that you can increase the years of disease-free survival by giving those women adjuvant chemotherapy?
[[Image here]]
“A. The data is based on several national studies done in this country and some in Europe which have treated women who had other risk factors, namely a large tumor and a high grade pathology, III, IV, in which in control groups in women who are compared without treatment, it appeared the length of time before recurrence improved with treatment and some recent minimal data showing improved survival.
[[Image here]]
“Q. You are speaking statistically and generally?
“A. Oh, absolutely. I mean, these criteria are by no means perfect. They are fraught with all sorts of problems of trying to interpret them and difficulty in them. And we’re still desperately in search of it because even if you take the most flagrant cases, we are still treating women who don’t need treatment, and we are still missing women who do need treatment. It’s a guess work. It’s not perfect.
“Q. But the statements that you made about — refer to populations at large.
“A. Absolutely, yeah.
“Q. You are not being patient-specific?
“A. No, absolutely. These are statistics taken on — it’s like saying, you know, drunk drivers have more accidents than *736 nondrunk drivers. Obviously, not every drunk driver has an accident.”
Finally, Dr. Viar testified as follows:
“A. I don’t know the data that would have been derived from a study of ‘X’ number of women with one positive node. So, if you are asking me what is the five-year survival rate in women with breast cancer and one positive node—
“Q. Yes.
“A. —I do not know that.”
None of these physicians testified to any causative relationship between Dr. Elder’s conduct and Mrs. Pope’s death. On the other hand, in support of his motion for summary judgment, Dr. Elder offered the affidavit of Dr. Hankins, who was Mrs. Pope’s treating oncologist. Dr. Hankins stated:
“If Mrs. Pope had been referred to me in October, 1986 with one node positive, ER negative, and no other evidence at that time of metastatic disease, she probably would have been a candidate for adjuvant chemotherapy. At that time I likely would have given her Cytoxan, Methotrexate, and 5FU. Even if diagnostic studies at that time had shown no evidence of metastatic disease, the possibility of widespread, yet undetectable disease could not be ruled out. It may or may not have been present at that time.
“I am not of the opinion that Mrs. Pope probably would have been cured if she had received adjuvant chemotherapy in 1986. The delay in chemotherapy from October, 1986 to August, 1988 might possibly have caused some small statistical loss of chance for longer survival. This would be based solely on statistics, and could not be said with any probability for Mrs. Pope’s specific case. The delay in starting chemotherapy did not cause her death.
“I am not of the opinion that this delay in the onset of the chemotherapy probably caused Mrs. Pope to die when she died. I am not of the opinion that the application of adjuvant chemotherapy to Mrs. Pope in October, 1986 would have increased her chances for cure. I am not of the opinion that Dr. Elder’s pathology report probably caused her death. I am not of the opinion that any act or omission on the part of Dr. Elder probably caused Mrs. Pope to die when she died.”
(Emphasis in original.)
Our standard of review in a summary judgment case is well settled. The, summary judgment was proper if there was no genuine issue of material fact and Dr. Elder was entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. Dr: Elder had the burden of making a prima facie showing that no genuine issue of material fact existed and that he was entitled to a judgment as a matter of law. Long v. Jefferson County, 623 So.2d 1130,1132 (Ala.1993). “[W]hen the movant makes a prima facie showing that no genuine issue of material fact exists, ... the burden shifts to the non-movant to show ‘substantial evidence’ in support of his position.” Leonard v. Providence Hosp., 590 So.2d 906, 907 (Ala.1991).[2] In deciding whether there was a genuine issue of material fact, we view the evidence in the light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Long, 623 So.2d at 1132.
In McAfee v. Baptist Medical Ctr., 641 So.2d 265 (Ala.1994), our supreme court discussed the plaintiffs burden of proof in medical malpractice cases, which, that court reiterated, requires proof that the alleged negligence ‘“probably caused the injury.’” 641 So.2d at 267 (quoting Parrish v. Russell, 569 So.2d 328, 330 (Ala.1990)). Our supreme court in McAfee specifically rejected the “loss of chance doctrine,” and that holding applies in this case.[3] 641 So.2d at 267. The medical testimony here indicated that Mrs. Pope’s breast cancer could not have been prevented *737 or cured. Her cancer had spread to other parts of her body, but the medical testimony established only the statistical estimate that, with treatment, she would have survived about two years longer. There was no testimony that Dr. Elder’s mistake proximately caused her death. Indeed, while the medical data on breast cancer prognosis and treatment here are statistical, they do not point to any specific conduct of Dr. Elder as the proximate cause. See McAfee, 641 So.2d at 267-68. Hence, there is nothing to show that Dr. Elder’s conduct probably caused Mrs. Pope’s death. As the trial court stated in entering the summary judgment:
“Although there is generalized testimony based on statistical data that the ability to treat a patient improves with early diagnosis, this testimony does not rebut the Defendant’s expert testimony that even if Mrs. Pope had received in 1986 the treatment later received in 1988 such treatment would have had no effect on her ability to survive.... Plaintiffs own experts offer no opinion concerning whether Dr. Elder’s failure to make an earlier diagnosis of a positive lymph node either lessened [her] chances of survival or worsened her condition. Plaintiffs brief asserts that Mrs. Pope’s cancer spread to her liver as a likely result of the missed diagnosis, but no evidence supports the assertion. Accordingly, no substantial evidence or even a scintilla of evidence suggests that Mrs. Pope’s death was proximately caused by the missed diagnosis.”
(Emphasis in original.)
Let the judgment be affirmed.
The foregoing opinion was prepared by SAM A BEATTY, Retired Justice, Supreme Court of Alabama, while serving on active duty status as a judge of this court under the provisions of § 12~18-10(e), Ala.Code 1975.
AFFIRMED.
All the judges concur.

. Dr. Hankins defined “adjuvant chemotherapy” as follows:
*733 "Originally, it meant to give chemotherapy in a setting in which you had no [known] disease left behind, knowing ahead of time that a certain percentage of those people would recur, and that giving you the drugs when it was — if it was there, it was presumed to be in microscopic amounts, you would either improve survival or decrease the rate of return or increase the time that it would take for the disease to reoccur.”

. The applicable standard of review is the "substantial evidence" rule. § 12-21-12, Ala.Code 1975. “Substantial evidence” is defined as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).

. The "loss of chance doctrine” is described as the loss of the chance "to achieve a better medical outcome.” See McAfee, 641 So.2d at 267 n. 1.