Jackie Shanes, as administratrix of the estate of her mother, Allene Shaw Moore, deceased, appeals from a, judgment entered on a directed verdict for Dr. Galen Kiser in Shanes's action against him alleging medical malpractice. This case arose out of the following facts:
On November 2, 1993, 52-year-old Allene Moore visited the emergency room at Medical Center-Shoals Hospital, complaining of "cramping," or "gas pains," in the chest or upper abdomen, "radiating to the back." She reported that she had no history of heart problems and that she had experience these same symptoms some years before. She was nauseated, and she vomited during the examination.
She was treated, by Dr. Galen Kiser, who performed a number of tests, including chest X-rays and an electrocardiogram ("EKG"). The EKG indicated some abnormality. Dr. Kiser concluded that Moore was probably suffering from a gallbladder problem, and, after she had been in the emergence room approximately three hours, released her with instructions to seek further medical attention the following morning if her symptoms persisted.
The next morning, however, Moore's body was discovered on the couch in her home, where she had died during the night. Although the coroner's report listed as the cause of death an "acute myocardial infarction," that is, a heart attack, no autopsy was performed and the cause of death was never determined on the basis of a medical examination.[1]
On November 1, 1995, Shanes sued Dr. Kiser, along with others. Her complaint alleged that Dr. Kiser had "negligently . . . or wantonly diagnosed . . . or failed to diagnose . . . Moore's condition and/or [had] negligently . . . or wantonly failed to admit her to the hospital for observation . . . or further care or treatment." Eventually, Shanes narrowed and refined her claim to allege that Moore had died of a heart attack as a result of Dr. Kiser's failure properly to diagnose or treat a heart-related problem."
In the trial of the cause, Shanes presented the expert testimony of Dr. Ronald Shaw in an attempt to establish the cause of death and a causal connection with Dr. Kiser's alleged negligence. After the close of the plaintiff's case, the trial court directed a verdict for Dr. Kiser, on the ground that the necessary causal connection had not been established. Shanes appealed the judgment entered on that verdict, contending that she had presented evidence sufficient to defeat the motion for a directed verdict, and, consequently, that the trial court erred in directing a verdict against her. We affirm.
"A directed verdict is proper (1) where the nonmoving party has failed to present substantial evidence regarding some element essential to her claim, or (2) where there is no disputed issue of fact upon which reasonable persons could differ." Teague v.Adams, 638 So.2d 836, 837 (Ala. 1994). "In medical malpractice cases, the plaintiff must prove that the alleged negligence `probably caused the injury.'" McAfee v. Baptist Medical Ctr.,641 So.2d 265, 267 (Ala. 1994). "The plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge or experience." Id. As to causation, an action "may properly be submitted to the jury where there is evidence *Page 321 
that prompt diagnosis and treatment would have placed the patient in a better position than she was in as a result of inferior medical care." Parker v. Collins, 605 So.2d 824, 827 (Ala. 1992). But the proof must go further than merely show that an injury could have occurred in an alleged way — it must warrant the reasonable inference and conclusion that it did so occur as alleged.'" McAfee, 641 So.2d at 267 (quoting McKinnon v. Polk,219 Ala. 167, 168, 121 So. 539, 540 (1929) (emphasis added)). Moreover, an `inference merely that it could so occur does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.'" Id. (emphasis added). Regarding causation, this Court has also said:
 "`"Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, from the same proof the injury can with equal probability be attributed to some other cause."
 "`But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deductible from them as a reasonable inference. There may be two or more plausible explanations as to how an even happened or what produced it; yet, if the evidence is without selective applications to any one of them, they remain conjectures only'".
Howard v. Mitchell, 492 So.2d 1018, 1020 (Ala. 1986) (quoting earlier cases) (emphasis in Howard). "`Verdicts may not be rested upon pure supposition or speculation, and the jury will not be permitted to merely guess as between a number of causes, where there is no satisfactory foundation in the testimony for the conclusion which they have reached.'" National Life AccidentIns. Co. v. Allen, 285 Ala. 551, 556 234 So.2d 567, 572 (1970) (quoting Colonial Life Accident Ins. Co. v. Collins, 280 Ala. 373,378, 194 So.2d 532, 537 (1967), and earlier cases).
Shanes contends that this case is controlled by Parker, a case that began when Joyce Parker discovered a lump in in her breast in January 1988 and consulted Dr. Wyatt Collins, who ordered a mammogram, but interpreted it "as negative for cancer." Id., 605 So.2d at 825-26. Approximately a year later, "another physician diagnosed [her] as having breast cancer." Id. at 826. Subsequent surgery resulted in the removal of the breast and several mammary glands, which were found to be cancerous. Id. She "then underwent a series of chemotherapy and radiation treatments to help destroy any cancer cells that might have spread into her lymph nodes."Id.
She and her husband, Joseph Parker, sued, among others, Dr. Collins, alleging that he "negligently performed a mammogram upon Mrs. Parker and . . . then negligently interpreted the test results to be negative." Id. at 825. Her theory of the case was "that with earlier detection of the cancer Mrs. Parker would have avoided chemotherapy and radiation treatment and would have had a better chance for long-term survival." Id. at 826.
At trial, Mrs. Parker presented expert testimony "as to the effect of the delay in diagnosing her condition." Id. "Based on the evidence regarding the size of the lump [initially] discovered by Mrs. Parker . . ., as well as the medical evidence surrounding the subsequent growth of the lump, [her expert testified] that he was 80% certain that the cancer had not spread into [her] lymph nodes as of January." Id. She also presented expert testimony indicating that her "mastectomy and the course of chemotherapy and radiation treatments that followed were necessary, because the cancer had spread into her lymph nodes," and that "breast cancer has a higher rate of recurrence once it has spread into the lymph glands." Id. The trial court granted Dr. Collins's motion for a directed verdict, on the basis of causation concluding that "there was no evidence to show that the [alleged] negligence of Dr. Collins caused Mrs. Parker to undergo a course of treatment in December 1988 that she would not have had to endure in January 1988." Id. at 826-27.
This Court disagreed with the trial court and reversed the judgment based on the directed verdict. We explained "While the facts do not establish that Mrs. Parker's *Page 322 
cancer could have been prevented altogether if Dr. Collins had rendered a prompt diagnosis based on a clearer X-ray, medical testimony suggests that [her] condition worsened as a direct result of a diagnosis based upon a substandard X-ray." Id. at 827. We concluded that the "evidence was sufficient to create a jury question as to proximate cause." Id. However, Parker does not control this case, where the overriding issue is whether Dr. Kiser's alleged failure to diagnose Moore's symptoms as a "heart-related problem" was a cause in fact of her death.
Dr. Kiser breached the standard of care, Dr. Shaw proposes, because he should have (1) admitted Moore to the hospital for observation, (2) consulted a cardiologist, or (3) kept her longer in the emergency room "for further tests," which, Shanes theorizes, would probably have revealed the onset of a heart attack. Dr. Shaw's opinion that Moore's death was "heart-related" was based on two factors, namely, (1) statistical probabilities and (2) evidence of Moore's medical history and the symptoms she was experiencing the day before she died.
Dr. Shaw's opinion as to the first factor was based on statistics suggesting that more people die each year of heart-related problems than of any other cause. His opinion was based in part on this statement in Emergency Medicine: AComprehensive Study Guide (Judith E. Tintinalli et al. eds., 4th ed. 1995): "Ischemic heart disease and its complications cause the greatest member of deaths in the United States, approximately 600,000 each year." In that connection, he testified as follows:
 "Q. [Defendant's attorney:] You don't know what caused her death any more than the coroner does or anybody sitting in this room does?
 "A. [Dr. Shaw:] Other than using the probabilities, no.
 "Q. Just using statistics is what you called it in your deposition throughout — using statistics —
"A. Right.
 "Q. — that more people die and it's related to heart attack than anything else if you don't know the cause?
"A. That's right.
 "Q. If I drop dead right this second and you didn't know why and nobody did an autopsy, you would say my death was myocardial infarction, wouldn't you?
"A. Yes."
The uncertainty of the cause of Moore's death was compounded by the fact that both Dr. Kiser and Dr. Shaw also identified at least three conditions not heart-related that could have resulted in a sudden death such as Moore's, namely, (1) a massive stroke, (2) a `pulmonary embolus,"[2] or (3) a "ruptured aorta aneurysm."[3] Moreover, some of the symptoms overlap, that is, they may be typical of more than one of these four potentially fatal conditions. For example, there was testimony indicating that both a heart problem and a ruptured aortic aneurysm could be associated with pain "radiating to," or being felt in, the back. Additionally, Dr. Shaw testified that a pulmonary embolus would be accompanied by chest pain.
Also, the "abnormality" in Moore's EKG consisted of the "inversion" of some "T-waves," that is, the recorded electronic transmissions from her body. Dr. Shaw testified that this abnormality could be associated with a variety of maladies. Specifically, he stated:
 "Q. [Defendant's counsel:] What can cause somebody to have an inverted T-wave?
 "A. [Dr. Shaw:] It could be a normal variant — could be normal for that individual. It could be due to ulcers, gallbladder disease, abnormalities of chemicals in the body, thyroid trouble, trouble with the adrenal glands. There's lots of conditions that, could cause it."
There was also evidence indicating that Moore might have exhibited symptoms not associated with a heart problem. For example, *Page 323 
there was evidence suggesting that she had experienced a headache the night before she was examined by Dr. Kiser. Dr. Shaw testified that headaches are often associated with an impending,stroke.
To confuse matters further, the record reveals some uncertainty as to precisely what symptoms Moore was experiencing when she visited the emergency room. For example, Dr. Kiser attempted discover whether she had been sweating, because, he said, sweating may be symptomatic of a heart problem. Moore told Dr. Kiser that she had not been sweating. However, her daughter, who accompanied her to the emergency room, stated that she had been
sweating.
In fact, Dr. Shaw conceded that the actual cause of death was a matter of speculation and conjecture. Specifically, he testified
 ""Q. [Defendant's counsel:] Okay. I think I understand finally. You are saying statistically she had [a heart attack] because you can't find another cause?
"A. [Dr. Shaw:] That's correct.
 "Q. But, you don't know, and you can't say with any reasonable medical certainty that she didn't have one of these other causes. That's all I'm trying to find out. You don't know that, do you?
"A. Not for sure, no.
 "Q. And you'll never know it for the rest of your life because no autopsy was done?
"A. That's correct.
 "Q. It would be — it's going to be pure speculation, though, which one of these causes of death was her cause of death?
 "A. Well, speculation the way we have already discussed, yes.[4]
 "Q. It's conjecture on your part, though, which one it is, isn't it?
"A. Yes."
The evidence Shanes presented would have, had the court not directed the verdict, invited the jury to speculate, or to guess, as to the cause of death. The distinctions between this case andParker are, therefore, apparent. Unlike this case, in Parker the identity of the injury-causing agency — cancer — was never indoubt. Thus, the Parker jury was never invited to speculate as to the cause in fact of the plaintiff's injury. In this case, however, a jury could not have concluded — without engaging in speculation — that Dr. Kiser's failure to diagnose a heart
problem placed Moore in a worse position than she would have been in had Dr. Kiser taken either of the alternatives Shanes proposes.
In Parker, moreover, the expert testimony was able to address directly, based on the relationship between the sizes of the lump when it was first discovered and when it was removed a year later, the probable involvement of the associated tissues with the malignancy during the period of nontreatment caused by the defendant doctor's failure to diagnose cancer. In this case, by contrast, because the cause of death was never medically ascertained, Shanes's expert witness could not testify as to the standard of care allegedly breached.
More specifically, Shanes based her theory of the case — and, consequently, her expert testimony — solely on the assumption that Moore died of heart failure, which fact was *Page 324 
never established. All of Dr. Shaw's testimony as to the breach of the standard of care related to what might have been done to prevent, or reduce the effects of, a heart attack. Significantly, if, in fact, Moore died of one of the other three possible causesdiscussed, then the record provides no evidence as to thestandard of care allegedly breached, that is, as to what Dr. Kiser should have done under those circumstances to prevent Moore's death or to reduce the effects of the malady. If Moore died of a condition not heart-related, then Shanes presented no evidence as to how Dr. Kiser breached the standard of care relevant to that
condition. As we have stated previously in this opinion, "[t]he plaintiff must prove the alleged negligence through expert testimony, unless an understanding of the alleged lack of due care or skill requires only common knowledge or experience."McAfee v. Baptist Medical Ctr., 641 So.2d 265, 267 (Ala. 1994).
This case is more like Pope v. Elder, 671 So.2d 730
(Ala.Civ.App. 1995). That case involved an action commenced against Dr. James Elder by Douglas Pope and his wife Linda Pope. The Popes alleged that Dr. Elder had failed to find malignant cells in a lymph node following Mrs. Pope's mastectomy in 1986.Id. at 732. In 1988, Mrs. Pope's breast cancer recurred, with inflammatory characteristics which . . . made it an aggressive, incurable disease." Id. Mr. Pope died of an undetermined cause during the litigation.
Dr. Elder moved for a summary judgment, contending "that the Popes presented no expert testimony that his failure to identify the malignant cells in one of Mrs. Pope's lymph nodes was the proximate cause of her death." Id. The trial court granted Dr. Elder's motion, explaining:
 "Although there is a generalized testimony
based on statistical data that the ability to treat a patient improve with any diagnosis, this testimony does not rebut the Defendant's expert testimony that even if Mrs. Pope had received in 1986 the treatment later received in 1988 such treatment would have had no effect on her [emphasis in original] ability to survive. Plaintiff's own experts, offer no opinion concerning whether Dr. Elder's failure to make an earlier diagnosis of a positive lymph node either lessened [her] chances of survival or worsened her condition. Plaintiff's brief asserts that Mrs. Pope's cancer spread to her liver as a likely result of the missed diagnosis, but no evidence supports the assertion. Accordingly, no substantial evidence or even a scintilla of evidence suggests that Mrs. Pope's death was proximately caused by the missed diagnosis."
Id. at 737 (emphasis added except where noted). Quoting the trial court's reasoning with approval, the Court of Civil Appeals affirmed the summary judgment. Id.
Like the Popes' case, Shanes's case turns largely on the materiality of generalized statistical data. The inference is stretched even further in this case, however, because the statistical data are not used to assess the extent of the injury, as they were in Pope, but to identify the injury-causing agency itself. Indeed, Shanes's theory of causation is based on somewhat circular reasoning (1) that Moore must have died of a heart attack because she was exhibiting symptoms associated with a heart problem, and (2) that she must have been experiencing symptoms associated with a heart problem because she died of a heart attack.
In short, the failure medically to determine the actual cause of Moore's death is fatal to this action. This is so because, without such a determination, there is no evidence relating specifically to Ms. Moore., and, consequently, no evidence relating to how Dr. Kiser breached the standard of care in his diagnosis and in his treatment of her. The judgment of the trial court is, therefore, affirmed.
AFFIRMED.
HOOPER, C.J. and MADDOX, ALMON, SHORES, HOUSTON, KENNEDY, SEE, and LYONS, JJ., concur.
[1] There was testimony indicating that the coroner's report was not based on medical evidence or analysis.
[2] Trial testimony defined "pulmonary embolus" as a "blood clot in the lung."
[3] Dr. Kiser defined an "aneurysm" as a "ballooning out of the blood vessel," which, "if it ruptures," generally results in death.
[4] Dr. Shaw sought to reinforce his probability analysis by attempting to eliminate the other three most probable causes of Moore's death. Specifically, he stated:
 "Now, what I was saying — about what these circumstances are, first of all, let's take the aneurysm. Okay. Dr. Kiser didn't feel an aneurysm when he examined the abdomen. And an aneurysm that would have ruptured and killed somebody sometime within the next few hours — where we don't know the precise time of death, but somewhere in the next several hours after being seen — an aneurysm [is] something that would have been detected on examination . . . You know, it is something he would have felt. So I don't think she had an aneurysm.
 "Then the second one would be a stroke . . . Well, people who drop dead of strokes usually have high blood pressure. They usually complain of headaches. They complain of double vision, numbness in an arm or a leg, the fact, something like that . . .
 "And then the third most common cause is . . . a pulmonary embolus, which is a blood clot in the lung. Again, the common presentations of a blood clot would be shortness of breath [and] chest pain, but the chest pain that comes along with a blood clot — usually — not always but is usually on one side of the chest or the other. Spitting up blood — there was no evidence of that, or a rapid heart rate, and we have no evidence of that."
(Emphasis added.) *Page 325