Margaret Lyons, as administratrix of the estate of Kenneth Cook, filed a wrongful-death case against Walker Regional Medical Center and Laurie Hunter, a registered *Page 939 
nurse employed by Walker Regional. Walker Regional and Hunter moved for a summary judgment. Initially, the trial court denied their motion. Walker Regional and Hunter asked the court again to grant their motion, and the court did. Lyons moved to alter, amend, or vacate the summary judgment, but the court denied her motion. Lyons appealed from the defendants' summary judgment. We reverse and remand.
 Standard of Review
In order to enter a summary judgment, the trial court must determine (1) that there is no genuine issue of material fact and (2) that the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. In order to defeat a defendant's properly supported motion for summary judgment, the plaintiff must present "substantial evidence," i.e., "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989). In determining whether a summary judgment was properly entered, the reviewing court must view the evidence in a light most favorable to the nonmovant. Long v. JeffersonCounty, 623 So.2d 1130, 1132 (Ala. 1993).
 Facts
The trial court recited the following undisputed facts in its initial "Memorandum Opinion and Order" denying the defendants' motion for summary judgment:
 "On May 7, 1994, Kenneth Cook was a detainee at the Walker County Jail. On that day, he was taken to Walker County Regional Hospital where he complained of pain in his lower abdomen, nausea and vomiting blood for two weeks.
 "At 4:00 p.m., Kenneth Cook's vital signs were taken by Deborah Evans, a registered nurse, employed by Walker Regional Medical Center. Deborah Evans did not usually work in the emergency room. She had only worked in the Emergency Room on a few occasions prior to May 7, 1994. The hospital policy required that triage nurses have two years of ER experience.
 "On May 7, 1994, Deborah Evans' emergency room duties as triage nurse included placing patients in beds, taking the initial assessments, initial vital signs, and ordering initial lab work. Evans took Kenneth Cook's blood pressure, pulse, temperature, and respiration. His blood pressure was 159/106. According to Ms. Evans, Kenneth Cook's pulse was a little fast and his blood pressure was higher than normal.
 "Evans drew blood for a CBC at 4:15 p.m. She did not know what to do when the results came back nor did she know what the procedure was as far as placing the results in the chart. She knew that sometimes they have baskets where charts are placed pending lab results. When the results come back, they are placed with the chart and put in the basket for the doctor to see.
 "The CBC results were reported at 5:37 p.m. They showed a slightly elevated white blood cell count, which indicated a possible infection. These results were written onto the front page of Cook's chart. Evans was not the person who obtained the CBC results, and Evans testified that she never knew the results of the CBC. After the CBC was ordered, Evans turned the treatment of Kenneth Cook over to Hunter.
 "On May 7, 1994, Deb Williams was scheduled to work as a Data Terminal Operator (hereinafter DTO), but she called in sick. Therefore, until Rochelle *Page 940 
Harris arrived at a little before six o'clock, Laurie Hunter had to act as RN, Charge Nurse, and DTO.
 "According to the lab results, the blood for the electrolytes, PT and PTT was collected at 5:26 p.m. On the front sheet, there is a notation in the lab ordered/collected section that at 5:08 LH ordered the electrolytes, PT and PTT.
 "Laurie Hunter testified that she did not order that the electrolytes, PT and PTT specimen be collected. Hunter does not have personal knowledge as to who ordered this particular lab work, but normally a physician in the emergency room department orders the lab work. Hunter also testified that under the hospital's standard protocols . . . there are occasions where nurses order lab work, but she does not know if electrolytes are covered under these protocols. Moreover, Dr. Marshall Boone testified that he never ordered the electrolytes, PT and PTT; in fact, he reviewed Cook's medical records and observed that these tests were ordered before he saw Cook at 5:45 p.m.
 "Laurie Hunter does not remember whether she put the electrolytes into the lab, but she admitted that since she was a DTO until Rochelle arrived that would have been her responsibility. Hunter also admitted that she knew that the electrolytes, PT and PTT had been ordered, but she never bothered to check to see if the results had been received.
 "According to laboratory results concerning Kenneth Cook, an initial result on the electrolytes, PT and PTT was reported at 5:43, and these results warned that more results for this specimen were pending. These laboratory results were placed on the front page of Cook's chart.
 "At 5:45 p.m., Dr. Marshall Boone saw Kenneth Cook for an assessment. When a person complains about gastrointestinal hemorrhage, he has to be evaluated to determine whether he has blood in his stomach. Dr. Boone ordered a nasogastric tube to be used to check for blood in Cook's stomach. This test required a painful process wherein the tube is inserted down the patient's esophagus into his stomach. Deborah Evans tried to insert this tube, but Kenneth Cook complained that the procedure was hurting him. Evans informed Laurie Hunter that Cook did not want her to insert the tube. Ms. Hunter said that she would attempt to insert the tube. Ms. Hunter explained the procedure to Cook and why it was necessary. Nevertheless, Cook continued to refuse to have the tube inserted. Kenneth kept telling Ms. Hunter that he knew what was wrong with him, that it was his appendix, that the nurses did not know what they were doing, and that the hospital should check him for his appendix instead of trying to stuff the tube down his throat. The only medical treatment that the nurses attempted on Kenneth Cook was to try to put the NG tube down his throat.
 "At 6:05 p.m., Laurie Hunter had Kenneth Cook sign a form indicating that he was refusing medical treatment against medical advice. Ms. Hunter told Kenneth that `after signing out AMA, you understand you could die or something else could happen to you,' which is what she tells all her patients. When Laurie Hunter had Kenneth Cook sign out, she did not tell Mr. Cook or his guard that he had high blood pressure, that his pulse was high, that his phosphate level was high, that his potassium level was high, that electrolyte results were still pending, nor did she inform Mr. Cook that he had ketoacidosis, a life threatening condition. In fact, no instructions whatsoever were given to *Page 941 
Cook, his guard, or the Walker County Jail before or after they went back to the jail.
 "Cook's electrolyte results were reported at 6:07 p.m. over the computer. The results revealed that the BUN was a little elevated at 26, the upper limit of normal is 23. The potassium was markedly elevated at 7.2, with an upper limit of normal being 5.3. The result was highlighted with the words `PANIC VALUES EXCEEDED' in bold capital letters. The chloride was normal at 101. The carbon dioxide content was 7, which is low, with the minimum normal value being 23. This result was highlighted with the words `PANIC VALUES EXCEEDED' in bold capital letters. The glucose was markedly elevated at 599, with an upper limit of normal of 106. This result was highlighted with the words `PANIC VALUES EXCEEDED' in bold capital letters. The creatinine, which is another measurement of renal function, was elevated at 2.6, with a normal upper limit of 1.4. Kenneth Cook's electrolyte results showed that he had diabetic ketoacidosis, which cannot be diagnosed without the electrolyte test. The electrolytes were at panic levels because they showed that Kenneth Cook would be a dead man if he was not treated for the ketoacidosis.
 "According to the hospital's policy and procedure manual, whenever lab results indicate that panic values have been exceeded, the lab department is required to immediately phone the results to the charge nurse. The policy and procedure manual requires that the panic values are to be then reported to the attending/on call or consulting physician immediately. In addition, the lab department is required to send the panic level results through the computer system and the results are printed out in the emergency room. Then, either a nurse or the DTO will pull off the results and write them on the front page of the chart. Normally, it is the DTO's responsibility to receive the results.
 "Unlike the other test results, the electrolytes results were never written down on the front page of Kenneth Cook's medical chart. When the panic level results came out over the computer at 6:07, Ms. Hunter was filling out her discharge paperwork on Kenneth Cook, because at 6:10 p.m., she noted on his medical chart that he had signed out and that she had been unable to put the NG tube down. After Hunter finished her paperwork concerning Cook, she gave his medical records to the DTO, Rochelle Harris, for billing purposes. Ms. Harris testified that she recalled logging in the billing information concerning Cook, but she does not recall what she did with Cook's file after she logged in the information. Normally, after she logs in a patient's billing information, she takes the patient's medical chart to out-patient registration. Harris did log in the billing information because bills were issued concerning Kenneth Cook.
 "Laurie Hunter testified that once a patient is discharged, such as Kenneth Cook, the patient is no longer the hospital's responsibility, and there is no need to report panic levels. Hence, after Ms. Hunter completed Cook's medical chart, she never bothered to check to see if the remaining of the electrolytes, PT and PTT results had come back. In fact, no one at the hospital bothered to check on Cook's results nor did anyone ever tell the doctor that the results were still pending. No one bothered to tell the doctor, Kenneth Cook, or his jailer that the tests were still pending, nor did anyone ever tell the doctor, Cook, or his jailer the panic level results. Kenneth *Page 942 
Cook was then brought back to the Walker County Jail.
"Kenneth Cook died on May 10, 1994."
 Discussion
To maintain a medical-malpractice action, the plaintiff ordinarily must present expert testimony from a "similarly situated health-care provider" as to (1) "the appropriate standard of care," (2) a "deviation from that standard [of care]," and (3) "a proximate causal connection between the [defendant's] act or omission constituting the breach and the injury sustained by the plaintiff." Pruitt v. Zeigler, 590 So.2d 236, 238
(Ala. 1991) (quoting Bradford v. McGee, 534 So.2d 1076, 1079 (Ala. 1988)). The reason for the rule that proximate causation must be established through expert testimony is that the issue of causation in a medical-malpractice case is ordinarily "beyond `the ken of the average layman.'" Golden v. Stein, 670 So.2d 904, 907 (Ala. 1995), quoting Charles W. Gamble, McElroy's Alabama Evidence, § 127.01(5)(c), p. 333 (4th ed. 1991). The plaintiff must prove through expert testimony "that the alleged negligence `probably caused the injury.'" McAfee v. BaptistMed. Ctr., 641 So.2d 265, 267 (Ala. 1994).
The trial court initially denied the defendants' motion for summary judgment, holding that the evidence created a genuine issue of fact as to the issue of causation. The defendants moved the court to "reconsider" that denial, arguing, as they do on appeal, that Shanes v. Kiser,729 So.2d 319 (Ala. 1999), supports their theory that Lyons was required to present the testimony of an expert witness on the question whether the defendants' alleged breach of the standard of care had proximately caused Cook's death. The trial court held, on its reconsideration of the denial, that, based on our holding in Shanes, Lyons could not carry her burden of proving that the defendants' alleged breach had proximately caused Cook's death. We disagree.
The defendants' reliance on Shanes is misplaced. In Shanes, the plaintiff's decedent sought emergency treatment for pain in her chest and upper abdomen that radiated to her back. She reported that she did not have a history of heart disease and that she had experienced the symptoms some years earlier. The plaintiff alleged, among other things, that the doctor should have consulted a cardiologist and should have performed other tests that might have revealed the onset of a heart attack. We held that the doctor could not be found to have breached the standard of care, given the uncertainty as to what had caused the decedent's death. Although the medical expert testified, based on statistical probabilities and the decedent's medical history and symptoms, that the death was heart-related, both the medical expert and the doctor who had treated the decedent identified at least three conditions with overlapping symptoms that were not heart-related and that could have resulted in sudden death. Id. at 322.
In this present case, Dr. Joseph Embry, a medical examiner with the Alabama Department of Forensic Sciences, stated in his affidavit that it is his professional opinion, within a degree of medical certainty, that Cook died of ketoacidosis due to diabetes mellitus. He also concluded, based upon the autopsy he did on Cook's body, that "no other injuries or natural disease processes caused or contributed to cause his death." Thus, unlike the Shanes case, this case presents little, if any, uncertainty in the record regarding the cause of death.
Lyons presented substantial evidence supporting her claim against Walker Regional and Hunter: (1) She offered expert testimony from a similarly situated health-care *Page 943 
provider regarding the appropriate standard of care, (2) she presented evidence indicating that the defendants had deviated from that standard of care; and (3) she demonstrated a proximate causal connection between Cook's death and the defendants' omission constituting the breach.
Lyons offered the expert testimony of Deborah Calhoun and Susan Atkinson to establish negligence. Calhoun and Atkinson are both registered nurses and work in an emergency room. Calhoun and Atkinson both testified that Walker Regional and Hunter had failed to provide Cook with the professional medical services, care, and treatment that similar medical providers within the medical community possessing and exercising ordinary and reasonable medical knowledge and skills would have provided. Cook's laboratory results stated "PANIC VALUES EXCEEDED." Atkinson testified that Hunter's failure to follow up on, and to report, the panic values was a breach of the standard of care.
Dr. Marshall Boone, Jr., the doctor on call at Walker Regional the night Cook died, testified in his deposition that he had treated similar cases of ketoacidosis. He testified that if Cook had been at the hospital (when they discovered that he had ketoacidosis), then he, Dr. Boone, would have placed Cook on IVs to try to get his blood sugars to normal levels. He testified that he would have stabilized Cook's condition and would have put him on a regimen to control his blood sugar. Dr. Boone also testified that, within a reasonable degree of medical certainty, he thought Cook would have survived if he (Dr. Boone) had treated him. Dr. Boone further testified in his deposition:
 "Q. Would it be fair to say that you as the emergency-room doctor would have liked to have seen [the results of the electrolytes test] on May 7th?
"A. Absolutely.
 "Q. And if you had seen it, would you have made specific warnings and recommendations to Kenneth Cook, yourself?
". . . .
 "A. If Mr. Cook had still been present, I would have done everything in my power to have kept him from leaving the hospital; I would have put him in an ICU. Now, remember that he would have had to agree with that.
 "Q. I understand that, but he never had the opportunity, for whatever reason?
 "A. Correct, but if he were still physically present in the emergency department, I wouldn't let him leave until I told him, if you leave this place, you're going to die.
"Q. Right.
 "A. You know, case closed, you go to the ICU and we treat you or you die. If he had already left, say he were in the car being transported or whatever, I would have called everybody that I could have called and said, you know, we got a man here that if we don't treat him, —
"Q. He's dead.
"A. — he's dead.
"Q. I mean, there wasn't any doubt about that, was there?
"A. No sir, absolutely not.
 "Q. Okay, but you couldn't do that because you didn't have those results?
 "A. That's correct. And I was frankly shocked when I saw the results yesterday.
". . . .
 "Q. And would you — if he wasn't in the facility, would you have contacted whoever had custody of him?
"A. Yes, sir. *Page 944 
"Q. And told them what?
 "A. I would have told them to bring him back to the hospital.
"Q. Why?
 "A. That he was critically ill and he needed treatment on an emergency basis, and we needed to talk to him to try to coerce him into letting us treat him.
 "Q. And then if you had that opportunity to speak with him, would you have been very specific as to the fact that in your opinion, he was as good as dead if he refused treatment?
". . . .
"A. Absolutely.
 "Q. And I assume that if he said to you, I'm not letting anybody put that tube down me, you wouldn't consider that, would you, a carte blanche refusal of medical treatment for the other condition; that is, for the elevated electrolytes, would you?
"A. No, sir.
 "Q. And if somebody ever testifies that a refusal of a tube down the throat is a refusal of all medical treatment, would that be reasonable to you?
". . . .
 "A. No, sir, it's not uncommon for patients to refuse one form of treatment but agree to other forms."
(R. 484-93.)
The record suggests that the hospital did not follow its procedures when the results of the electrolytes test were not recorded on the front of Kenneth Cook's chart. Dr. Boone's testimony suggests that the results of the electrolytes test were critical in assessing Cook's ailment. According to Dr. Boone, the results of the electrolytes test could have been used to save Cook's life. Whether Cook would have acquiesced to the treatment that would have been necessary to save his life is pure speculation and, more important, is immaterial to the question whether the defendants' alleged breach of the standard of care proximately caused Cook's death.
The defendants also argue that even if they were negligent, they are still not liable because Cook, they say, was contributorily negligent. We do not agree. "In order to prove contributory negligence, the defendant must show that the party charged: (1) had knowledge of the condition; (2) had an appreciation of the danger under the surrounding circumstances; and (3) failed to exercise reasonable care, by placing himself in the way of danger." Brown v. Piggly-Wiggly Stores,454 So.2d 1370, 1372 (Ala. 1984) (citing Hatton v. Chem-Haulers, Inc.,393 So.2d 950 (Ala. 1980); and Baptist Med. Ctr. v. Byars, 289 Ala. 713,271 So.2d 847 (1972)). The record shows that Cook was never informed of his life-threatening condition. It is questionable whether a blanket statement that "you could die" would have been enough to make him appreciate the danger of his condition, which even the defendants were unaware of until the laboratory results came back. Furthermore, Cook's cellmate testified by affidavit, in part, as follows:
 "[Cook] told me that a nurse was trying to stick tubes in his nose and that it put him in a lot of pain. He said that when he complained to her, she told him he was refusing treatment. Soon afterward, he said they released him from the hospital."
His cellmate testified further that Cook tried to return to the hospital after the initial visit. Thus, the record does not support a summary judgment based on a contributory-negligence defense.
The burden was on the defendants to make a prima facie showing, by substantial evidence, that no genuine issue of material fact existed. They did not carry their *Page 945 
burden. Consequently, we reverse the summary judgment entered in favor of Walker Regional and Hunter and remand this case for proceedings consistent with this opinion.
REVERSED AND REMANDED.
Hooper, C.J., and Maddox, Houston, Brown, and Johnstone, JJ., concur.