On Remand from the Supreme Court

YATES, Presiding Judge.
The Alabama Supreme Court has reversed this court’s judgment of November 17, 2000, and has remanded the case. See Ex parte Waddail, 827 So.2d 789 (Ala. 2001). On remand, this court is to address the issue whether Melanie Waddail presented substantial evidence of proximate cause.
A brief recitation of the facts and procedural history as set out in Waddail v. Roberts, 827 So.2d 784, 785-86 (Ala.Civ. App.2000), is necessary:
“On December 17, 1995, Melanie brought [her son] 12-year-old Adam to the emergency room at Elba General *797 Hospital. Adam, a diabetic, was nonre-sponsive with an elevated blood-sugar level after experiencing nausea and vomiting. Dr. Roberts is a doctor of osteopathy, who had a contract to provide emergency-room services at Elba General. Roberts consulted with Dr. John Stone, an endocrinologist in Dothan, who had been treating Adam. Adam was in diabetic ketoacidosis. Ketoacidosis is a condition whereby an insulin-dependent diabetic goes into an acidotic state and can no longer use glucose for energy.
“Roberts and Stone decided that Adam should be transferred to Southeast Alabama Medical Center in Dothan, because Elba General did not have the facilities to provide the specialized care Adam needed. At the Medical Center, Adam suffered respiratory arrest and stopped breathing. After two brain scans showed no neurological activity, Adam was declared dead on December 19, 1995.
“On October 24, 1997, Melanie sued Roberts, alleging he had wrongfully caused Adam’s death; she sued pursuant to § 6-5^481 et seq., the Alabama Medical Liability Act (‘AMLA’). Specifically, Melanie claimed that Roberts had failed to properly stabilize Adam before transferring him. Roberts moved for a summary judgment, arguing that Melanie had not presented substantial evidence of proximate cause, because an autopsy was not performed on Adam. Roberts also argued that Melanie had not presented competent expert testimony to establish the applicable standard of care. The trial court held that Melanie had presented competent expert testimony, but that she had failed to present substantial evidence of proximate cause.”
In its order granting Dr. Roberts’s summary-judgment motion, the trial court stated:
“The Plaintiff in an Alabama Medical Liability Act case must provide substantial evidence that the alleged negligence proximately caused the injury or damage. The Plaintiffs expert, Dr. Long-more, did not offer an opinion as to the cause of death, in fact, in his deposition Dr. Longmore testified that he would leave the cause of death to Dr. Stone and the in-patient doctors who cared for the minor child. Dr. Stone’s Death Summary and Discharge Summary lists seven (7) different final [diagnoses] for the minor child. There was no autopsy performed to confirm the precise medical cause of death.
“The rule in Alabama in medical malpractice cases is that to find liability there must be more than a mere possibility or one possibility among others that the negligence complained of caused the injury. McAfee v. Baptist Medical Center, 641 So.2d 265 (Ala.1994), and Levesque v. Regional Medical Center Bd., 612 So.2d 445 (Ala.1993). Without conclusive medical evidence as to the cause of death, the Plaintiff could not state a medical malpractice claim. Shanes v. Kiser, 729 So.2d 319 (Ala.1999).”
We affirmed the summary judgment entered in favor of Dr. Roberts. Relying on § 6-5-548(e) and Johnson v. Price, 743 So.2d 436 (Ala.1999), we held that Wad-dail’s expert, Dr. Longmore, was not qualified to testify about the standard of care, because he was certified by a different medical board than Dr. Roberts. The supreme court reversed, noting that § 6-5-548(e) was not well-written; it clarified its holding in Johnson, concluding that Dr. Longmore was qualified to testify about the standard of care.
Dr. Stone prepared a “Death Summary/Discharge Summary” following *798 Adam’s death. He stated that upon arrival at the Medical Center, Adam “was found to be cyanotic” and required cardiopulmonary resuscitation and endotracheal intu-bation. According to Dr. Stone, Adam “failed to display any significant neurological activity during his entire stay” at the Medical Center. “The parents requested organ donation and as soon as two electroencephalograms were confirmed to be without activity, arrangements were made for that.” Dr. Stone listed the following final diagnoses:
“1. Hypoxic encephalopathy.
“2. Insulin dependent diabetes mellitus with ketoacidosis.
“3. Left upper lobe pneumonia, possibly aspiration.
“4. Upper gastrointestinal bleeding, probably due to ulceration.
“5. Diabetes insipidus.
“6. Dehydration.
“7. Hypokalemia.”
In an affidavit, Dr. Longmore opined:
“Based upon my educational training, practical experience, and review of the above documentation, it is my professional opinion that the standard of care was breached in that blood gases were not obtained on William Adam Waddail and adequate fluids (500 cc’s initially) were not given to resuscitate him in the emergency room at Elba General Hospital to stabilize his condition prior to transfer. Had his blood gases been obtained and adequate fluids (500-cc’s, initially) given, it would have been obvious that William Adam Waddail was not stable enough to be transferred, and he could have been stabilized prior to his transfer, which would most probably have resulted in this child’s survival.”
Dr. Longmore was deposed; he was asked whether he intended to testify as to the cause of Adam’s death. Dr. Longmore stated that he did not intend at trial to testify as to the cause of death. He stated that he would leave that determination to Dr. Stone and the others who had treated Adam. Specifically, Dr. Longmore said:
“I would just in general relate to the facts that the child, as you know, got very unstable, suffered a respiratory arrest, required intubation and that the hypoxic encephalopathy, or lack of oxygen to the brain, would relate to that period of instability, but overall, the cause of death to Dr. Stone and the people who were treating him in the hospital [sic].”
The following testimony occurred during Dr. Longmore’s deposition with regard to the cause of death:
“Q. You mentioned causation. And you told me earlier that you were not going to testify as to the cause of death in this case. Is it your testimony that the failure to get the arterial blood gases or the failure to stabilize was the proximate cause of this boy’s death or are you going to leave that to the other physicians?
“A. As I said earlier, the cause of death I would leave to Dr. Stone and the in-patient doctors who cared for him in the hospital. But in the general sense, I would, you know, my opinion was that the minimum standard was breached when Dr. Roberts failed to stabilize Adam effectively in the emergency department prior to transfer.
“He had been told to give the fluids, to see his response to the fluids, and the fact that the blood gas was available, it should have been taken as part of the standard work-up. That would be part of my opinion, that if he had appropriate fluid resuscitation, one, two liters based on his response at Elba, that his pH could have been stabilized, his dehydration could have been corrected, and I *799 think within a reasonable degree of medical certainty he wouldn’t have had that difficult ride to the hospital. He was at times unresponsive, he was bra-dycardie during the trip. He arrived with a respiratory arrest and unconscious, so he clearly had a difficult trip, which I think he could have avoided had he gotten adequate fluids at Elba prior to transfer.
“Q. But whether it was cerebral edema, respiratory depression, some type of infarction, you’re not going to express any opinion as to the cause of death?
“A. I agree in the general sense that I’m here to review the emergency medicine aspects of the case, and clearly my opinion is that this death within a reasonable degree of medical certainty could have been prevented had the child been stabilized.
“I think that his instability on arrival, that cardiac arrest or respiratory arrest was the key to his negative outcome. As you know, his heart was transplanted, his kidneys were transplanted, clearly his organs were not infarcted, but I would leave the cause of death to Dr. Stone and the people who had the expertise in the in-patient management.
“Q. There was no autopsy in this case, is that correct?
“A. That’s correct. As you know, there was organ donation in this case. But I don’t believe there was an autopsy, no.
“Q. As you testified before, the best evidence of the cause of death would have been an autopsy report?
“A. I agree with you. That is most specifically to determine it, yes.
“Q. We know that given the best treatment, the proper tests, such as arterial blood gases and proper fluid resuscitation, certain patients are going to die?
“A. I agree with you.
“Q. It’s just your testimony in this case that that somehow falls outside of that category?
“A. You know, as we’ve discussed, death does occur with diabetic ketoaci-dotic patients, and certainly not 50 percent or 100 percent; it does occur.
“This was a sick young man who responded very quickly to the fluids that were given at the [Dothan] hospital. He responded very quickly to that. So he appeared mostly to have a dehydration as his main cause of problems. He did not require a lot of bicarb when he got to Dr. Stone’s care. It was mostly fluids or two and a half liters that turned him around....”
Dr. Roberts argues that because there were several potential causes for Adam’s death and no conclusive evidence as to which one or ones caused his death, the plaintiff cannot present substantial evidence that any of his actions or inactions proximately caused Adam’s death. He relies on Shanes v. Kiser, 729 So.2d 319 (Ala.1999). The plaintiff argues that Dr. Roberts is misreading Shanes.
In Shanes, the plaintiff alleged that the emergency-room doctor failed to diagnose and treat her mother’s “heart-related problem” while her mother was in the emergency room. 729 So.2d at 320. The mother was released and was later found dead in her home. No autopsy was performed. Both the emergency-room doctor and the plaintiffs expert identified three other possible causes for her death. The plaintiffs expert expressed the opinion that the mother had died of a heart attack; the expert based that opinion on statistical data “suggesting that more people die each year of heart-related problems than any other cause,” and on the fact that the mother had exhibited symptoms in the *800 emergency room that might suggest a heart-related problem. 729 So.2d at 322. The supreme court wrote:
“More specifically, [the plaintiff] based her theory of the case — -and, consequently, her expert testimony — solely on the assumption that [her mother] died of heart failure, which fact was never established. All of [the plaintiffs expert]’s testimony as to the breach of the standard of care related to what might have been done to prevent, or reduce the effects of a heart attack. Significantly, if, in fact [the mother] died of one of the other three 'possible causes discussed, then the record provides no evidence as to the standard of care allegedly breached, that is, as to what [the emergency-room doctor] should have done under those circumstances to prevent [the mother’s death or to reduce the effects of the malady. If [the mother] died of a condition not heart-related, then [the plaintiff] presented no evidence as to how [the emergency-room doctor] breached the standard of care relevant to that condition.”
729 So.2d at 323-24 (emphasis in original).
The Shanes court affirmed the trial court’s judgment based on a directed verdict in favor of the emergency-room doctor. The supreme court distinguished the facts in Shanes from those in Parker v. Collins, 605 So.2d 824 (Ala.1992). In Parker, the plaintiff alleged that the defendant doctor had negligently performed a mammogram and, therefore, had failed to diagnose her breast cancer before the cancer spread to her lymph nodes. The plaintiff presented expert testimony indicating that if this cancer had been detected early she would have had no need for chemotherapy and radiation treatment and she would have had a better chance for long-term survival. 605 So.2d at 826. The Parker court reversed the trial court’s judgment based on a directed verdict entered in the doctor’s favor, holding that the evidence was sufficient to create a jury question as to proximate cause.
The Shanes court distinguished Parker, because in Parker the “injury-causing agent — cancer—was never in doubt”; therefore, the jury was not being asked to speculate as to the cause of the plaintiffs injury. 729 So.2d at 323. In Shanes, the jury would have had to speculate that the emergency-room doctor had failed to diagnose a heart-related problem. In Parker, the plaintiffs expert testified as to the size of the lump when it was first discovered and the size when it was removed a year later, the probable involvement of the surrounding tissues, and the spread of the malignancy during the period of nontreatment caused by the failure to diagnose cancer. The supreme court contrasted the facts of Parker with the facts of Shanes, because in Shanes the cause of death was never ascertained and, therefore, the plaintiffs expert could not testify as to the standard of care allegedly breached.
We conclude that the present case is analogous to Parker. Adam was suffering from diabetic ketoacidosis when he was admitted to the Elba hospital. Dr. Roberts treated Adam for this specific medical problem. The issue is whether, for the purposes of a summary-judgment motion, the plaintiff presented substantial evidence indicating that Dr. Roberts acted, or failed to act, in such a way as to lessen Adam’s chances of surviving this bout of diabetic ketoacidosis. Dr. Longmore testified that Dr. Roberts breached the standard of care by failing to properly stabilize Adam before he was transported to the Medical Center. Like the court in Parker, we know the injury-causing agent in this case, specifically diabetic ketoacidosis. Dr. Longmore testified that if Adam had been given enough fluids and if his blood gases *801 had been checked with the test available to Dr. Roberts, before Adam was transported, then, “within a reasonable degree of medical certainty,” he could say Adam would have survived the diabetic ketoaci-dosis.
In Shanes, it was necessary to know the precise cause of death, because the mother could have died from a heart attack, a massive stroke, a pulmonary embolism, or an aneurysm. Therefore, the plaintiff in Shanes failed to proffer the necessary expert testimony because she offered only opinions based on treatment of a patient with a heart-related problem. In the present case, Dr. Longmore deferred to Dr. Stone and the other doctors treating Adam, as to the cause of Adam’s death. However, the plaintiff offered expert testimony from Dr. Longmore indicating that Dr. Roberts had created a situation that made Adam less likely to survive diabetic ketoacidosis. In Parker, the supreme court held that the issue of causation in a malpractice case may properly be submitted to the jury where there is evidence that prompt diagnosis and treatment would have placed the patient in a better position than she was in, as a result of inferior medical treatment.
The plaintiff presented substantial evidence supporting her claim against Dr. Roberts: (1) She offered expert testimony from a similarly situated health-care provider regarding the appropriate standard of care; (2) she presented evidence indicating that Dr. Roberts had deviated from the standard of care; and (3) she demonstrated a proximate-cause relationship between Adam’s death and Dr. Roberts’s failure to stabilize Adam before he was transferred to Dothan. See Lyons v. Walker Reg’l Med. Ctr., 791 So.2d 937 (Ala.2000).
The judgment is reversed and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
CRAWLEY, PITTMAN, and MURDOCK, JJ., concur.
THOMPSON, J., concurs in the result.